IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KAVEH ASKARI a/k/a KEVIN ASKARI, individually and on behalf of ONCO360 HOLDINGS 1, INC., ONCO360 HOLDINGS 2, INC., AND ONCO360 HOLDINGS 3, INC.,<br><br>              Plaintiff,<br><br>vs.<br><br>PHARMACY CORPORATION OF AMERICA, GREG WEISHAR, PAUL JARDINA and DAVID FROESEL,<br><br>              Defendants,<br><br>and<br><br>ONCO360 HOLDINGS 1, INC., ONCO360 HOLDINGS 2, INC. and ONCO360 HOLDINGS 3, INC.,<br><br>              Nominal Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Kaveh Askari a/k/a Kevin Askari, on his own behalf and on behalf of Onco360 Holdings 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc. alleges the following against the defendants Pharmacy Corporation of America, Greg Weishar, Paul Jardina and David Froesel in this action:

## NATURE OF THE ACTION

1.    This action arises out of Defendants' fraud and intentional bad faith and material contractual breaches under the Amended and Restated Operating Agreement dated December 6, 2013 (the "Operating Agreement") of OncoMed Specialty, LLC (the "Company"), an entity owned by Plaintiffs and Defendants, whereby Defendants attempted to buyout a certain

percentage of Plaintiff's membership interests in the Company, which was worth  tens of millions, perhaps hundreds of millions, of dollars, for $1.

2.      Defendant Pharmacy Corporation of America ("PCA") and Plaintiffs entered into various transactions in December 2013, including the Operating Agreement.  The Operating Agreement provided Plaintiffs blocking rights for material decisions.  The Operating Agreement further provided PCA -- a 37.5% minority member -- with a phased right to buy-out Plaintiffs' membership interest in the Company.  However, the Operating Agreement protected Plaintiffs by establishing a defined purchase price which included a capped debt amount as a deduction therefrom.  The purchase price was also tied to the Company's performance, which was to be run pursuant to an agreed upon business plan which contemplated Plaintiff Askari's oversight of critical operations.  However, in violation of the Operating Agreement's expressed and implied obligations, Defendants larded the Company's balance sheet with unnecessary and unauthorized debt that they claimed reduced to almost nothing the amount PCA had to pay Plaintiffs for their membership interests.

3.      Specifically, PCA and its installed managers -- Defendants Weishar, Jardina and Froesel (the "Managers") -- unilaterally increased the secured line of credit PCA extended to the Company (which was capped at $10,000,000.00) to $64,000,000.00 and abused its control of the Company causing the Company to borrow at least $28,600,000.00 or more ($18,6000,000.00 above the agreed upon maximum working capital borrowing and not at all contemplated in the business plan that the parties agreed to) from an affiliate in direct violation of Plaintiffs' consent rights under the Operating Agreement.

4.      This unauthorized debt was not necessary to run the Company.   Rather, Defendants took these actions to wipe out any consideration Plaintiffs would have received for

selling additional interests in the Company to PCA pursuant to buy-out rights provided for in the Operating Agreement.

5.      After incurring this  unnecessary and unauthorized debt, Defendants then informed Plaintiff Askari that PCA intended to purchase *more* of the Company's shares in 2016 (the first buy-out) from Plaintiff Askari than it is entitled to under the Operating Agreement and pay only a nominal sum of $1.00 for a whopping 30.5% more of the Company from Plaintiff. Through these actions, Defendants not only attempted to secure the purchase of Askari's membership interest for virtually no consideration, in violation of the Operating Agreement, but also acted intentionally and in bad faith to solidify their control at an artificially reduced purchase price.

6.      The Managers have further breached the Operating Agreement by failing to properly calculate and/or refusing to make mandated tax distributions to certain Plaintiffs causing further monetary damages to certain Plaintiffs in an amount to be determined at trial.

7.      To lull Plaintiffs into not objecting to their bad faith actions, Defendants also engaged in fraud.  Specifically and as described in more detail herein, they made representations that they were acting to maximize the value of Plaintiffs' interests in the Company.  That could not be further from the truth.  Rather, they were incurring unnecessary debt and intentionally pursuing less profitable (but higher revenue) business solely to depress the purchase price Plaintiffs were to receive upon exercise of PCA's buy-out rights and to solidify PCA's absolute control over the Company.

8.      Through this action, Plaintiffs seek declaratory and equitable relief, as well as damages for Defendants' fraud and bad faith acts.  Specifically, Plaintiffs seek a declaration (i) declaring that PCA  has no further rights under the Operating Agreement,  including, but not

limited to, the right to control the Company, the right to purchase any Sina Members' membership interests in the Company under that agreement, the right to appoint the Company's Board of Managers, or the right to exercise drag along rights under that agreement; (ii) that certain amendments to the Loan Agreements (defined below) entered into without the required 75% membership interest consent are null and void and that any money provided to the Company pursuant to those amendments are capital contributions as a matter of law for any and all purposes, including, but not limited to, the calculation of a buyout price for the Sina Members' remaining interests under the Operating Agreement; (iii) alternatively, should this Court determine that Defendants may exercise any purchase rights under the Operating Agreement, the Court issue a judgment declaring that the purchase price must be calculated at the fair market value of the Sina Members' interests at stake as determined after an accounting of the books and records of the Company, or alternatively according to the agreed upon business Plan as defined herein, and including that any money exchanged through unauthorized amendments to loans is equity in the Company; and (iv) should this Court determine that PCA may exercise any purchase rights under the Operating Agreement, the Court issue a judgment declaring that the Operating Agreement permits PCA to acquire only a 14.95% interest in the Company in respect of PCA's first buyout right.

## PARTIES

9.      Plaintiff, Kaveh Askari, known as Kevin Askari ("Plaintiff" or "Askari"), is a citizen of New York.  Plaintiff, at all relevant times, continually owned 78% of the shares of each of Onco360 Holding 1, Inc., Onco360 Holdings 2, Inc., and Onco360 Holdings 3, Inc. (collectively referred to herein as the "Sina Members" and, with Askari, "Plaintiffs").  Askari is a

third-party beneficiary of certain rights under the Operating Agreement with standing to enforce those rights directly on his own behalf.

10.     Plaintiffs the Sina Members are Delaware corporations with a registered agent for service of process at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. The Sina Members, collectively own a 62.5% member interest in the Company.   The other 37.5% is owned by defendant PCA.  The Sina members' 62.5% interest in the Company effectively gives Askari a 49% equity share in the Company.

11.     Defendant PCA was and is a California Corporation with a principal place of business at 1901 Campus Place Louisville, Kentucky.  Upon information and belief, PCA is a wholly owned subsidiary of PharMerica Corporation ("PMC"), a publicly traded provider of institutional, specialty home infusion, and oncology pharmacy services in the United States.

12.     Defendant Greg Weishar ("Weishar") is, on information and belief, a citizen of Kentucky.  Weishar is the Chief Executive Officer of PMC and is a member of the Board of Managers of the Company.

13.     Defendant Paul Jardina ("Jardina") is, on information and belief, also a citizen of Kentucky.  Jardina has been and is the Company's President and Chief Executive Officer and member of the Board of Managers of the Company.

14.     Defendant David Froesel ("Froesel") is, on information and belief, also a citizen of Kentucky. Froesel was, until on or about September 30, 2016, the Chief Financial Officer of PMC and a member of the Board of Managers of the Company.

5

## JURISDICTION

15.     Plaintiffs bring this complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

16.     Defendants are subject to the personal jurisdiction of this Court as a result of their consent to jurisdiction and venue.   Additionally, defendants Weishar, Jardina and Froesel are subject to jurisdiction in Delaware pursuant to 6 *Del. C.* § 18-109 because they serve as managers of the Company.   This suit relates to the business of the Company and violations by these defendants of a duty to the Company's members under the Operating Agreement.

17.     Plaintiff Askari commenced an action in the New York State Supreme Court for the County of Nassau on November 4, 2016, seeking similar relief as is sought in this complaint. By Order entered on April 27, 2017, the New York State Supreme Court dismissed the complaint, without prejudice, upon the defendants' motion, based on a forum selection clause in a certain agreement between the parties entitled Membership Interest Purchase Agreement dated as of October 10, 2013 (the "Purchase Agreement") that designated venue in the Delaware Federal District Court.

18.     On December 5, 2016, PCA commenced an action against Plaintiff Askari in this Court entitled *Pharmacy Corporation of America v. Askari*, C.A. No. 16-cv-01123-RGA, alleging that Plaintiff Askari had breached the non-compete provisions of a certain Purchase Agreement described below.   Plaintiff Askari has denied the allegations of that complaint. The action is pending before the Court.

## FACTUAL ALLEGATIONS

*Specialty Pharmaceuticals & Specialty Pharmacies*

19.    It has been reported that prescription drug revenue exceeded $340 billion in 2014 and that more than $106 billion of that revenue is attributable to the sale of so-called specialty pharmaceuticals.

20.    Specialty pharmaceuticals are generally known to be products used to treat chronic, high-cost, or rare diseases.  Cancer is among such diseases.

21.    The four most common categories of specialty pharmaceuticals are office-administered injectable products, self-administered injectable products, clinic/office administered infusible products, and select oral agents.

22.    Oncology specialty pharmaceuticals can be injectable, infusible, or oral medications.   While oral oncology medications (and some forms of injectable oncology medications) can be administered at home, infusible and most injectable oncology medications are typically administered at a hospital or doctor's office.

23.    Specialty pharmaceuticals are often more complex to maintain, administer, and monitor than typical drugs, requiring closer supervision and monitoring of the patient's overall therapy.

24.    Specialty pharmaceuticals are serviced by specialty pharmacies.

25.    A specialty pharmacy is one that is created to manage the handling and service requirements of specialty pharmaceuticals.

26.    The services required by specialty pharmacies typically include dispensing, distribution, reimbursement, case management, and providing other services specific to patients with rare and/or chronic diseases.

27.     Oncology specialty pharmacies that provide infusible and injectable medications typically custom mix or "compound" prescriptions, which can only be done by a properly trained pharmacist.

28.     Specialty pharmacies, as opposed to retail pharmacies, are licensed to dispense specialty pharmaceuticals. Oncology specialty pharmacies that are designated by pharmaceutical manufacturers to dispense all types of oncology specialty pharmaceuticals, including the most restricted in product distribution, are often referred to as "high-touch" specialty pharmacies. The Company is one such high-touch specialty pharmacy.

***The Early History of Sina Drug/OncoMed***

29.     In 2002, Askari, a licensed pharmacist operating in the State of New York, founded a small specialty pharmacy known as Sina Drug Corp ("Sina"), located in Manhasset, New York.   At that time, Sina began doing business as OncoMed Pharmaceutical Services ("OncoMed").

30.     From 2003 until approximately 2006, OncoMed serviced various types of specialty pharmaceuticals, including compounded infusible and injectable medicines for oncology and for other purposes such as growth hormone, among other things.

31.     Infusible and injectable compounded specialty pharmaceuticals were the historical cornerstone of OncoMed's business.

32.     In approximately 2006, Askari, decided to narrow the scope of OncoMed's specialty pharmacy services to oncology specialty pharmacy.

33.     By January 2008, OncoMed's Manhasset facility had achieved revenues of approximately $20M.   Askari, positioned OncoMed to grow from a local oncology specialty pharmacy to a regional oncology specialty pharmacy.

8

34.     At or about that time, Askari determined that OncoMed would become an oncology specialty pharmacy provider that would manage all aspects of a patient's oncology pharmaceuticals, including the distribution, dispensing, and drug therapy management of those oncology specialty pharmaceuticals, among other things.

35.     OncoMed was the first oncology specialty pharmacy in the industry to market a high-touch, oncology-focused solution, whereby the specialty pharmacy compounded and dispensed all specialty medications necessary to treat patients under the direct supervision of specially trained oncology pharmacists.

36.     In connection with expanding its business platform, in 2008, OncoMed also invested in a state-of-the-art compounding facility in Great Neck, New York.   That facility became the heart of OncoMed's complete oncology management services and the "hub" of OncoMed's future specialty pharmacy locations.

37.     To accommodate OncoMed's growing patient base, OncoMed opened several local "spoke" pharmacies.   The "spoke" pharmacies dispensed prescriptions with short half-life products, prescriptions subject to certain regulations that require the dispensing pharmacy to be located within a particular state, or prescriptions that were more appropriately dispensed outside of the Great Neck "hub" facility for other reasons.

38.     Under the "hub-and-spoke" model, all prescriptions were processed centrally through the Great Neck hub ensuring that all patients received the highest level of pharmacist scrutiny and care and comprehensive patient management services.   In turn, these prescriptions were dispensed through "spoke" pharmacies when necessary.

39.     At all times, Askari acted as the supervising pharmacist to all other pharmacists employed by OncoMed.

40.     OncoMed's unique hub-and-spoke model positioned it to rapidly gain entrance into numerous attractive markets.

41.     From 2002 through 2007, OncoMed's revenue was overwhelmingly derived from infusible and injectable specialty prescription drug services.  During that time, the pharmacy built its strong reputation among doctors and hospitals and became a regional leader in specialty oncology compounding services.

42.     In 2007, Revlimid, the first oral oncology pharmaceutical, was FDA approved for market.  Revlimid, like many oral oncology pharmaceuticals that have since come to market, is a Limited Drug Distribution ("LDD") specialty pharmaceutical product.

43.     LDDs are medications that are distributed to a very limited number of high-touch specialty pharmacies and wholesalers.  LDDs are typically used to treat conditions that only affect a special needs patient population and that may have special and complex dosing requirements needing continual monitoring.

44.     One of the purposes of having a limited distribution specialty pharmaceutical is to permit specialty drug manufacturers the ability to ensure that those distributing the specialty pharmaceuticals have the necessary training and monitoring capability to reduce patient risk and assist the manufacturer with tracking inventory and manufacturer reporting requirements.

45.     Because of OncoMed's position as one of the  largest independent oncology specialty pharmacies in the United States and because of its outstanding reputation for quality, it was given the right to distribute Revlimid in 2008.  At that time, OncoMed also began dispensing oral oncology specialty pharmaceuticals, thereby establishing the Company's footing as a regional high-touch oncology specialty pharmacy.

46.     Upon receiving the right to distribute Revlimid, OncoMed was poised in the unique position to be a true "one-stop" specialty pharmacy for all oncology services -- infusible, injectable, and oral oncology pharmaceuticals.

47.     In other words, OncoMed was a unique specialty pharmacy that was able to provide all infusible and injectable pharmaceuticals for first-line treatment and was also able to provide the infusible and injectable specialty pharmaceuticals that are often adjunctive to oral oncology treatment.

48.     As a result of OncoMed's high level pharmacy operations model, in June 2010, OncoMed received a full thirty-six month accreditation from the Joint Commission Accreditation, Health Care ("JCAHO").  OncoMed was the first JCAHO-accredited independent oncology specialty pharmacy in the United States.

49.     By 2012, OncoMed was one of the largest independent specialty pharmacies in the United States with a stellar pharmacy operations reputation across the board in specialty oncology service lines.

50.     By the end of 2012, based upon OncoMed's outstanding oncology specialty pharmacy's reputation, the pharmacy had a large group of doctors and hospitals that relied upon OncoMed to compound their oral and infusible oncology pharmaceuticals.

51.     With its core Pharmacy Operations staff and procedures in place at OncoMed's Great Neck hub facility, OncoMed was therefore poised to take its one-stop oncology specialty pharmacy services model to a national level.

**PMC Approaches OncoMed And Proposes
A Three-Year National Expansion Plan**

52.     In or about midyear 2011, Askari and Burt Zweigenhaft ("Zweigenhaft"), the owner of a minority interest in Sina, decided to solicit offers to purchase an interest in OncoMed

from companies that could provide the platform necessary to bring OncoMed's service model to a national level.

53.    OncoMed prepared a company overview to share with potential investors, explaining OncoMed's business objectives.

54.    In seeking out investors, OncoMed emphasized that OncoMed was a complete "one-stop" specialty oncology management company with a distinctive service model that allowed OncoMed to effectively service all types of oncology specialty pharmaceuticals -- infusible, injectable, and oral oncology pharmaceuticals, including LDDs.

55.    In approximately August 2012, Weishar, then PMC's Chief Executive Officer, approached Plaintiff about the purchase of a significant interest in OncoMed.  Weishar expressed a keen interest in joining forces with OncoMed to assist in bringing OncoMed's unique business model to a national level.

56.    In approximately January 2013, PCA, through Weishar, began its in-depth review of the scalability of OncoMed's business model.

57.    At all times during the negotiation process, PCA represented that it was seeking to invest in the opportunity to provide a national platform for OncoMed's business model in order to increase OncoMed's ability to provide all lines of service -- infusible, injectable, and oral oncology pharmaceuticals -- nationally.

58.    At all times during the negotiation process, PCA represented that it would use PMC's pharmacy network connections to expand OncoMed's pharmacy network connections and operations, including oral and injectable pharmacy services, to increase OncoMed's revenue and  profit margins.  At that time, PMC was operating approximately 98 pharmacies within 45 states.

59.     At all times during the negotiation period, PCA was aware that OncoMed was going to receive the right to dispense Imbruvica, a LDD oral oncology drug. OncoMed did, in fact, receive the right to dispense Imbruvica approximately ten days after PCA purchased a minority interest in the Company.

60.     Imbruvica is a prescription medication used to treat people with chronic lymphocytic leukemia and mantle cell lymphoma among other things. Imbruvica is a once daily specialty oral oncology medicine that is used as a second-line treatment for these listed types of cancer.

61.     Imbruvica was anticipated by all the parties to be a significant source of steady future revenue and profit for OncoMed because it is a long-term treatment relative to typical oncology treatments.

62.     Receiving the right to dispense Imbruvica was also anticipated by the parties to be a significant source of new business for OncoMed because servicing patients with Imbruvica would expose the business to a significant new patient and doctor population on a national scale and be the launching pad for PCA's and Askari's shared vision for OncoMed's expansion and profitability growth. In fact, OncoMed was one of only five pharmacies with United States dispensing  rights to Imbruvica. In 2016, worldwide Imbruvica sales totaled approximately $1.75 billion.

63.     In order for OncoMed to fully realize the financial benefits of receiving the right to distribute Imbruvica, it needed to expand from a regional to a national oncology specialty pharmacy, which was the purpose of pursuing a transaction with PCA.

***The Three-Year Plan***

64.     During the approximately one-year due diligence and negotiation period, PCA and OncoMed prepared and agreed upon a three-year business plan (the "Plan") that set forth the parties' understanding as to how OncoMed would be operated in the future, it's business strategy and projected growth after the sale.

65.     On or about September 30, 2013,   Tim Jolly, PMC's then Director of Acquisitions, for PMC prepared a final version of the Plan (reflecting the three-year expansion plan), which was provided to all parties to the transaction.

66.     The Plan projected future earnings based upon expansion of the existing business model, which included infusible, injectable and oral oncology specialty pharmaceuticals.

67.     The Plan projected future revenue and profit of 9.5% per year, which projections were based in large part upon OncoMed's historical performance with infusible and injectable oncology service lines.

68.     Under the agreed-upon Plan, the Great Neck facility was to continue to serve as the "hub" to the other Company pharmacies throughout the United States.

69.     The Plan projected specific markets into which the Company was expected to expand immediately after the sale.

70.     The Plan also contemplated that PCA would make certain limited loans to the Company for the purpose of expanding the business network.  Such loans consisted of a term loan in an amount of $6.5 million and a working capital loan in an amount up to $10 million. Combined, the loans would not exceed $16.5 million.

71.     The Plan represented the parties' underlying understanding as to how the Company would be operated in the future and was the foundation as to how the Company would

maximize EBITDA, which in turn would provide the basis for calculating the price that PCA would ultimately be required to pay to buyout Askari's interests in OncoMed pursuant to the two remaining buy-out phases as discussed below.

### PCA's Purchase of a Minority Interest in OncoMed

72.     While finalizing the terms of the Plan, the parties then simultaneously negotiated a Plan of Business Reorganization, the Purchase Agreement, Askari's Employment Agreement, the Company's Operating Agreement and certain Loan Agreements -- all to effectuate the terms of the Plan and sale of an interest in OncoMed to PCA.

73.     Pursuant to the Purchase Agreement, on December 6, 2013, the Sina Members sold a 37.5% equity interest in the reorganized OncoMed to PCA.  The ownership structure of OncoMed's business had been reorganized according to the terms of a Plan of Business Reorganization dated December 3, 2013, and on December 6, 2013, the Company began doing business as Onco360.

74.     PCA and OncoMed also acknowledged that PCA would operate OncoMed according to the Plan after the sale.  Evidencing that understanding, Weishar, Askari and Zweigenhaft initialed the agreed upon Plan at the December 6, 2013 closing of the sale of the interest in OncoMed to PCA.

### The Loan Documents

75.     As noted, the transaction did contemplate that PCA or its affiliates would make certain limited loans to the Company for the purpose of expanding the business network.

76.     Article 1.1 of the Purchase Agreements defined the term "Loan Documents," providing:

> "Loan Documents" means that certain loan and security agreement
> to be entered into by the Company and the Subsidiaries, on one

hand, and the Buyer or its Affiliates, on the other hand, substantially in the form attached as Exhibit D hereto.

77.    The Loan Documents provided that the maximum amount of debt contemplated in the Loan Documents was a Term Loan amount of $6.5 million ($6,500,000) and a Working Capital Loan of up to $10 million ($10,000,000), for a total loan amount of up to $16.5 million ($16,500,000).

78.    Pursuant to the Loan Documents, the Term Loan and the Working Capital Loan (collectively defined in the Loan Documents as the "Loans") were to be secured by the assets of the Company.

79.    Those Loans (capped at an aggregate amount of $16.5 million) were agreed to by the Sina Members (as sellers) and PCA (as buyer) in the October 10, 2013 Purchase Agreement and were confirmed by the parties nearly two months later when the definitive Loan Agreement and Operating Agreement each dated December 6, 2013 were executed and delivered at the December 6, 2013 closing of PCA's purchase from the Sina Members. The executed version of Loan Agreement dated December 6, 2013, provided in relevant part:

**LOAN AGREEMENT**

This Loan Agreement (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is dated as of December 6, 2013 (the "Closing Date") by and among Oncomed Specialty, LLC, a Delaware limited liability company ("Holdco"), and each of its Affiliates and Subsidiaries listed on Exhibit A attached hereto, and any additional borrower that may hereafter be added to this Agreement (each individually as a "Borrower," and collectively as "Borrowers"), and Pharmacy Corporation of America, a California corporation (together with its successors and assigns, "Lender").

RECITALS

WHEREAS, Holdco, Lender, Kaveh Askari, Burt Zweigenhaft, the parties set forth on Exhibit A-1 thereto, the parties set forth on

16

Exhibit A-2 thereto, and Kaveh Askari, in his capacity as the Sellers' Representative entered into that certain Membership Interest Purchase Agreement dated October 10, 2013, whereby Lender acquired 37.5% of Holdco (the "Purchase Transaction").

WHEREAS, in *connection with the Purchase Transaction*, Borrowers desires [sic] to enter into a financing transaction with the Lender pursuant to which the Lender will commit, subject to the terms and conditions set forth in this Agreement, to (i) make a term loan to Borrowers in the amount of $6,500,000.00 (the "Term Loan") and *(ii) make advances to Borrowers up to the aggregate principal amount of $10,000,000.00 (the "Working Capital Loan", and together with the Term Loan, the "Loans").*

WHEREAS, Borrowers have agreed to secure all of its obligations under the Loans by granting to Lender a security interest in and lien upon all of its existing and after-acquired personal and real property.

* * *

## 2. LOANS

### 2.1   Term Loan Amount

(a)   Subject to the terms and conditions set forth in this Agreement, the Lender agrees to loan to Borrowers on the terms and conditions set forth in this Agreement $6.5 million (the "Term Amount").

(b)   The Term Loan shall be evidenced by a promissory note substantially in the form of Exhibit B attached hereto (the "Term Note"), and Borrowers shall execute and deliver the Term Note to Lender. The Term Note shall represent the obligation of Borrowers to pay to Lender the amount of the outstanding Term Amount, together with interest thereon as prescribed in Section 2.3.

(c)   The aggregate outstanding Term Amount shall be due and payable on the Maturity Date.

### 2.2   Working Capital Loan

(a)   *Commitment Amount and Advances.*

(i)   Subject to the terms and conditions set forth in this Agreement, and until ten (10) days prior to the Maturity Date [the

earlier of (i) the date on which a purchase of additional shares of Holdco is made by Lender pursuant to Article IX of HoldCo's Amended and Restated Operating Agreement and (ii) December 6, 2018], the Lender shall from time to time make advances on the terms and conditions set forth in this Agreement of up to a maximum amount of $2,000,000 during each thirty (30) calendar day period commencing with the Closing Date ("Advances") to Borrowers under the Working Capital Loan provided that the aggregated outstanding principal amount of advances shall not exceed at any one time the Working Capital Loan Limit. Any sums advanced pursuant to this Section and subsequently repaid may be re-borrowed from time to time.  Borrower may request advances in excess of $2,000,000 in any thirty (30) calendar day period; provided however, the decision to allow such an advance is solely in the absolute discretion of the Lender.

(ii)     The Working Capital Loan shall be evidenced by a promissory note substantially in the form of Exhibit C attached hereto (the "Revolving Note"), and Borrowers shall execute and deliver the Revolving Note to Lender.  The Revolving Note shall represent the obligation of Borrowers to pay to Lender the amount of the Working Capital Loan Outstandings, together with interest thereon as prescribed in Section 2.3.

(iii)The aggregate outstanding Working Capital Loan Outstandings shall be due and payable on the Maturity Date.

* * *

## ANNEX A (Recitals)
### to
## LOAN AGREEMENT

## DEFINITIONS

* * *

"Maturity Date" means the earlier of (i) the date on which a purchase of additional shares of Holdco is made by Lender pursuant to Article IX of HoldCo's Amended and Restated Operating Agreement and (ii) December 6, 2018.

"Working Capital Loan Availability" means, at any time, the Working Capital Loan Limit minus the Working Capital Loan Outstandings.

"Working Capital Loan Borrowing" means a borrowing of the Working Capital Loan.

"Working Capital Loan Commitment" means $10,000,000.

"Working Capital Loan Limit" means the Working Capital Loan Commitment.

"Working Capital Loan Outstandings" means, at any time of calculation, the then existing aggregate outstanding principal amount of Working Capital Loans.

***"Working Capital Loan" has the meaning ascribed to it in the recitals ["up to the aggregate principal amount of $10,000,000"] ) (emphasis added).***

80.   Thus, by the express terms of the Loan Agreement, the Working Capital Loan was expressly defined by the Purchase Agreement as an amount of "up to $10,000,000."

***The Company's Operating Agreement***

81.   In connection with the sale, an Amended and Restated Limited Liability Company Operating Agreement dated as of December 6, 2013 (the "Operating Agreement") for the Company was also executed at closing.

82.   The Operating Agreement contained material terms governing the operation of the Company, protections for the Sina Members and the phased acquisition by PCA of a greater interest in the Company from Askari and/or the Sina Members.

83.   Article I of the Operating Agreement relates to General Provisions and provides certain definitions relating to the document, including:

"Affiliate" shall mean with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  For the purposes of this definition, the term "controls," "is controlled by" or "under common control with" means (i) the direct or indirect ownership of in excess of 50% of the equity interest (or interests convertible into or otherwise exchangeable for equity interests) in a Person, or (ii) possession of the direct or indirect right to vote in excess of 50% of the voting Securities or elect in excess of 50% of the Board of Directors or

other governing body of a Person (whether by Securities ownership, contract or otherwise). Each officer, Manager or Member of the Company or officer, director or stockholder of the Manager shall be deemed to be an "Affiliate" of the Company. Each officer, manager, member, director or stockholder of a Member or an Affiliate of such Member shall be deemed to be an "Affiliate" of such Member.

"Agreement" means this Amended and Restated Operating Agreement, as the same may be amended hereafter from time to time as provided herein.

* * *

"Board of Managers" shall mean the Company's Board of Managers established in accordance with Article V.

* * *

"Manager" shall have the meaning set forth in Section 5.1.

"Member" means the PharMerica Member, the Sina Members and each other Person who after the date hereof is admitted to the Company as a Member as provided in this Agreement and the Act.

"Membership" means the status of being a Member.

"Membership Interest" means, with respect to any Member, (a) such Member's status as a Member, (b) such Member's right to receive distributions from the Company, (c) all other rights, benefits, and privileges enjoyed by such member (whether under the Act or this Agreement) in its capacity as a Member, including such Member's rights (if any) to vote, consent and approve and otherwise to participate in the management of the Company, and (d) all obligations, duties and liabilities imposed on such Member (whether under the Act or this Agreement) in its capacity as a Member.

* * *

"Percentage Interest" shall mean, as to any Member, the percentage interest in all Membership Interests of the Company represented by such Member's Membership Interest, as set forth on **Exhibit A** hereto; provided that, for the avoidance of doubt, at any time, the sum of Percentage Interests of all Members shall always be one hundred percent (100%).

"Person" shall mean an individual, partnership, limited partnership, limited liability partnership, limited liability company,

corporation, trust or unincorporated organization, and a government or agency or political subdivision thereof.

"PharMerica Member" shall mean Pharmacy Corporation of America.

\* \* \*

"Related Party Transaction" shall have the meaning set forth in Section 5.15(a).

\* \* \*

"Sina Members" shall mean (i) Onco360 Holdings 1, Inc., (ii) Onco360 Holdings, 2, Inc., (iii) Onco360 Holdings 3, Inc.

\* \* \*

"Net Debt" shall mean an amount equal to (i) $6.5 million plus (ii) the amount of debt owed by the Company to the PharMerica Member or its Affiliates under the Working Capital Loan (as defined in the Loan Documents (as defined in the Purchase Agreement)) minus (iii) the amount of the Company's cash and cash equivalents (emphasis added).

\* \* \*

84.     By the express terms of Article I of the Operating Agreement, "Net Debt" "shall mean an amount equal to (i) $6.5 million plus (ii) the amount of debt owed by the Company to the PharMerica Member or its Affiliates under the Working Capital Loan ( as defined in the Loan Documents ( as defined in the Purchase Agreement)) [an amount up to $10,000,000]minus (iii) the amount of the Company's cash and cash equivalents" (emphasis added).

85.     Article II of the Operating Agreement relates to Members and provides in pertinent part:

2.1     Members. The Company shall consist of the Members and such additional and substituted Members as shall be admitted to the Company pursuant to Article VII. **Exhibit A** shall be amended from time to time to reflect the admission of any Member or the removal, withdrawal, death or adjudication of incapacity of any Member or

the receipt by the Company of notice of any change of the name of a Member.

* * *

2.4     Actions by Members. Any action requiring the vote or approval of the Members shall only be valid by the affirmative approval of the Members holding at least **75%** of the Percentage Interests. Any action by written consent shall be promptly delivered (i) to the Company, for recordation in the proceedings of the Members and (ii) to the other Members (emphasis added).

2.5     Manner of Consent. Any consent or approval of the Members required by this Agreement may be given as follows:

(a) by a written consent given by the consenting Members at or prior to the taking of the action for which the consent is solicited, provided that such consent shall not have been nullified by either (i) notification to other Members by the consenting Member at or prior to the time of, or the negative vote by such consenting Member at, any meeting held to consider the taking of such action or (ii) notification to other Members by the consenting member prior to the taking of any action which is not subject to approval at such meetings; or

(b) by the affirmative vote of the consenting Member to the taking of the action for which the consent is solicited at any meeting duly called and held to consider the taking of such action (emphasis added).

86.     By the express terms of Article II of the Operating Agreement, actions requiring consent "shall only be valid" by the "affirmative approval of the Members holding at least 75% of the Percentage Interests."

87.     By the express terms of the Operating Agreement, any prior consent action requires the prior affirmative consent of Askari as the majority shareholder of the Sina Members, to be valid.

88.     By the express terms of Article II of the Operating Agreement, such affirmative prior approval must be given "at or prior to the taking of the action" in order for action to be valid.

22

89.     Article V of the Operating Agreement relates to Management and provides in

pertinent part:

> 5.1     <u>Board of Managers</u>. The Company shall have a Board of Managers consisting of three (3) members (each, a "<u>Manager</u>" and collectively, the "<u>Managers</u>"). All three (3) Managers shall be appointed by the PharMerica Member.  As long as Membership Interest in the Company are held, directly or indirectly, by Keveh Askari or Burt Zweigenhaft, each of Kaveh Askari and Burt Zweigenhaft, respectively, shall be permitted to attend and observe each meeting of the Board of Managers (each, a "Board Observer") strictly as observers and shall have no vote.

* * *

> 5.8     <u>Actions Requiring Consent of Members</u>. The Members shall have no right to participate in the management of the Company.  All rights of Members pursuant to the Act are hereby disclaimed. Notwithstanding the foregoing or anything in this Agreement to the contrary, no action shall be taken, sum expended, decision made or obligation incurred with respect to a matter within the scope of any of the major decisions enumerated below (the "<u>Major Decisions</u>"), unless such Major Decision has been approved by the Members holding at least 75% of the Percentage Interests. The Major Decisions are:

* * *

> (b) causing (A) the sale, pledge, lease, or other disposition of all or any substantial portion of the assets of the Company or Subsidiaries (other than sales of inventory in the ordinary course of business), or (B) the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of the Company or Subsidiaries, except as contemplated by the Loan Documents (as defined in the Purchase Agreement);

> (c) enter into any Related-Party Transaction that is not specifically authorized pursuant to Section 5.9[.]

* * *

> 5.9     <u>Related Party Transactions</u>. Any lease contract or agreement or any other transaction or arrangement involving payments or remuneration between the Company and any Member or Affiliate of

23

a Member (a "<u>Related-Party Transaction</u>") must be disclosed to the Board of Managers and each Board Observer and receive approval of the Board of Managers. The Company is specifically authorized to: (i) engage in any transaction that involves a Member or Affiliate of a Member providing services, equipment or supplies to the Company in exchange for consideration for such services, equipment or supplies that is no greater than an amount the Company would pay to obtain such services, equipment or supplies from a Third Party, as reasonably determined by the Board of Managers: (ii) to participate in any joint purchasing arrangements to which any of the Members or their Affiliates are a party; (iii) to engage the PharMerica Member or any of its Affiliates for the activities set forth on the Shared Services Agreement substantially in the form attached hereto as **Exhibit B**; and (iv) to obtain debt financing from an Affiliate of the PharMerica Member on terms that are equivalent to those available to such Affiliate of the PharMerica Member in an arm's-length transaction with a Third Party providing debt financing to such Affiliate of the PharMerica Member.

90.     By the express terms of Articles II and V of the Operating Agreement, a "Major Decision" that requires the affirmative prior consent of 75% of the membership interest approval includes "the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of the Company or Subsidiaries, except as contemplated by the Loan Documents (as defined in the Purchase Agreement)".

91.     In sum and more plainly, by the express terms of Article V of the Operating Agreement, the Sina Members (sellers) gave PCA control rights to the Company but retained blocking rights for all Major Decisions, including any decision regarding placing further liens on the Company assets or to increase the indebtedness under the Loan Documents to any amount above what was contemplated in the Purchase Agreement and agreed on under the Plan (a Term Loan in an amount of $6.5 million, a Working Capital Loan in an amount up to $10 million and combined such Loans in an amount of no more than $16.5 million).

92.     Askari's blocking right (through the Sina Members) was fundamental to the deal and a material term of the Operating Agreement.

93.     Article VI of the Operating Agreement relates to Books of Account, Records and Reports and provides in pertinent part:

> 6.1     Maintenance of Books and Records, Etc. The Company shall maintain books and records in such manner as is utilized in preparing the Company's United States federal information tax return in compliance with the Code, and such other records as may be required in connection with the preparation and filing of the Company's required United States federal, state and local income tax returns or other tax returns or reports of foreign jurisdictions, including, without limitation, the records reflecting the Capital Accounts and adjustments thereto specified in ARTICLE III. The foregoing and all other books and records of the Company (including the information described in Section 18-305(a) of the Act) shall at all times be made available at the principal office of the Company and shall be open to the reasonable inspection and examination of the Members or their duly authorized representatives during normal business hours.

> \* \* \*

> 6.3     Financial Statements and Other Reports.   Subject to the Board of Managers receiving all necessary information from third parties, within forty-five (45) days after the end of each of the first three (3) fiscal quarters in each Fiscal Year and within ninety (90) days after the end of each Fiscal Year of the Company, the Board of Managers shall send to each Person who was a Member (or Economic Interest Owner) of the Company at any time during the Fiscal Year then ended a statement of assets, liabilities and members' (or Economic Interest Owners') capital as of the end of such fiscal period and related statements of income or loss and changes in assets, liabilities and Members' (or Economic Interest Owners') capital, all prepared on the same basis used for the computation of adjustments to Capital Accounts.

94.     By the express terms of Section 6.1 of the Operating Agreement, all Members, including Askari (through the Sina Members), on behalf of the Sina Members, are "at all times" also entitled to an inspection of "all other books and records of the Company. . . ."

*The Phased Buy-Out of Askari's and the Sina Members' Interests*

95.     Article XI of the Operating Agreement relates to Sale and Purchase Rights of

Askari and the Sina Members (the "Buy Out Rights").  It provides in pertinent part:

>      9.1     Sale and Purchase Right.
>
>      (a) At any time following the 36 month anniversary of the Effective
>      Time, (the "Third Year PharMerica Call Option Initial Trigger
>      Event") the PharMerica Member shall have the right, but not the
>      obligation, to purchase up to 30.5% of the Membership Interests (the
>      "Initial Interests") owned directly or indirectly by Kaveh Askari (or
>      his successor-in-interest to the Membership Interests) and up to all of
>      the Membership Interests owned directly or indirectly [sic] Burt
>      Zweigenhaft  (or  his  successor-in-interest  to  the  Membership
>      Interests) in the Company as of the date of the Third Year
>      PharMerica Call Option Initial Trigger Event from such Sina
>      Members by providing written notice of such election to such Sina
>      Members, such sale and purchase to be effected in the manner, upon
>      the terms, and for the consideration set forth in ARTICLE IX.
>
>      (b) Within sixty (60) days of the 60 month anniversary of the
>      Effective Time (the "Second Trigger Event"), the PharMerica
>      Member shall purchase all of the remaining Membership Interests
>      owned by the Sina Members in the Company as of the date of the
>      Second Trigger Event from the Sina Members by providing written
>      notice of such election to the Sina Members, such sale and purchase
>      to be effected in the manner, upon the terms, and for the
>      consideration set forth in this ARTICLE IX.
>
>      9.2     Determination of Purchase Price
>
>      (a) The purchase price for the Membership Interest purchased pursuant
>      to the provisions of Section 9.1(a), 9.1(b), or 9.1(c) shall be an
>      amount equal to (A) (i) the product of (x) the trailing twelve (12)
>      months of EBITDA and (y) the Valuation Multiplier, less (ii) the Net
>      Debt of the Company, less (iii) the purchase price for any acquisition
>      of assets, business or Person by the Company, unless such amount is
>      included in the calculation of Net Debt ["Net Debt" shall mean an
>      amount equal to (i) $6.5 million plus (ii) the amount of debt owed by
>      the Company to the PharMerica Member or its Affiliates under the
>      Working Capital Loan (as defined in the Loan Documents (as
>      defined in the Purchase Agreement)) minus (iii) the amount of the
>      Company's cash and cash equivalents], multiplied by (B) the
>      Percentage Interests of the Company being purchased.

* * *

96.     By the express terms, set forth in Section 9.2, of the purchase price ("Purchase Price"), "Net Debt" for the determination of Purchase Price shall mean $6.5 million plus the amount of debt owed under the Working Capital Loan "as defined in the Loan Documents" as such terms is "defined in the Purchase Agreement[.]" The "Working Capital Loan" as defined in the Loan Documents as "up to the aggregate principal amount of $10,000,000." Thus, "Net Debt" for purposes of the Section 9.2 Purchase Price formula is expressly capped at an amount equal to an amount up to $16.5 million minus the Company's cash and cash equivalents. Such secured indebtedness cap is bolstered by the requirement for the Sina Members' consent to any additional loans secured by the Company's assets. Increasing the Company's indebtedness under such Loans is a Major Decision subject to the prior consent of the Sina Members, which consent right was bargained for.

97.     As set forth above, any increase in the Company's secured debt above the capped amount of the Working Capital Loan Amount and the agreed upon $6.5 million term loan constitutes a Major Decision under Section 5.8 of the Operating Agreement. Accordingly, PCA could not validly increase the Working Capital Loan amount without first receiving prior consent of 75% of the Membership Interest which could not be obtained without Plaintiffs' consent.

98.     As set forth above, the reason for the consent right provision was to ensure that PCA could not use its effective control to leverage unilaterally the Company through intercompany loans for any purpose. Certainly, either explicitly or implicitly, Defendants could not cause the Company to take on unnecessary loans for the purpose of increasing the Company's Net Debt as it relates to the Purchase Price in order to depress the value of the Company and to deprive the Plaintiffs of the benefit of their bargain with PCA.

99.     That is, the Major Decision blocking right was intended to prevent PCA from having the ability to use its control rights to unilaterally cause the Purchase Price to be an amount of $0.00 simply by entering into secured intercompany loans constituting "Net Debt", regardless of their business purpose, regardless of the effect such loans had on the Company's business operations and/or profitability, and without the Sina Members' consent.

***Askari's Three-Year Employment Guaranteed
By the Purchase and Operating Agreements***

100.    PCA agreed that Askari would remain in charge of pharmacy operations after the sale for a minimum of three years, the timeframe of both the initial growth and expansion reflected in the Plan and the exercise date of PCA's first call right.

101.    PCA's commitment to Askari that he would continue in his role as Vice Chairman and Chief Clinical Officer for at least three years after the sale was memorialized in Askari's employment agreement with the Company (the "Employment Agreement"). The execution and delivery of the Employment Agreement was a required condition to the closing of the sale of the equity interests of the Company to PCA and was executed simultaneously with the Operating Agreement at the December 6, 2016 closing of PCA's purchase.

102.    The terms of the Employment Agreement provided that Askari (seller) "shall be employed as the Vice Chairman and Chief Clinical Officer" of the Company.

103.    The Employment Agreement provided that the Company was obligated to employ Askari in that position for three years:

> The Company shall employ the Executive [Kevin Askari], and the Executive shall serve the Company, on the terms and conditions set forth in this Agreement, beginning on the Starting Date [December 6, 2013] and until the third anniversary date of this Agreement, unless that employment sooner ceases as provided below in Section 4 (the "Employment Period")."

28

(Section 1.).

104.   That agreement further provided that Askari would continue to have authority

over the Company's pharmacy operations during that time:

> The Executive shall be responsible for (i) clinical operations of the
> Company, including quality assurance, (ii) assisting in identifying
> and establishing new pharmacy sites, (iii) assist with purchasing of
> pharmaceuticals and (iv) training and establishing training
> programs for pharmacists employed by the Company, and (v)
> supporting the sales initiatives of the Company."

(Section 2.(a) (herein referred to as "Pharmacy Operations").)

105.   Askari's Employment Agreement provided that Askari "shall be based in the

Great Neck, New York office of the Company." (*Id.* at 2.(b)).

106.   Askari's Employment Agreement provided that "[a]ny relocation [by Askari] to

an office outside of a reasonable readius [sic] of Great Neck, New York will require the consent

of Executive [Askari]." (*Id.*).

107.   Keeping the hub of the operations in Great Neck was agreed upon as part of the

Plan because Askari and another pharmacist at the Great Neck hub held all the required state

pharmacy licenses for the OncoMed business.  Moreover, Great Neck was the largest branch and

most of the support services required on site, such as accounting, collections, central purchasing

and prior authorization existed in Great Neck. Finally, Great Neck was registered to dispense

Revlimid (sales of which were material to the OncoMed business and profitability and thus the

future purchase price due the Sina Members).   Many other branches were not registered to

dispense Revlimid.   The Plan was based upon the understanding that Great Neck remain the

OncoMed hub in order to achieve the contemplated OncoMed results of operations.  In fact, the

Plan "used Great Neck as a baseline with Staffing Model" and the Plan evidences the crucial

importance of the Great Neck hub.   All patient care decisions and troubleshooting issues were addressed from the qualified personnel at the Great Neck hub.

108.   Askari's Employment Agreement provided that the Company may terminate the Executive's employment under this Agreement during the Employment Period "solely for Cause[,]" which was narrowly defined in the Employment Agreement. (*Id.* at 4.(b).).

109.   The purpose of the "for cause" provision contained in Askari's Employment Agreement was not financial, as Askari's salary was guaranteed even if his position was so terminated.   Rather, the purpose of the provision, and the reason that Askari insisted upon its inclusion, was to ensure that he would retain influence and control of the day-to-day Pharmacy Operations after selling a significant equity interest in the Company  to  PCA for at least the initial three-year expansion period contemplated by the parties leading up to the first call right.

110.   Askari negotiated these contractual rights to protect his ability after the sale to influence Pharmacy Operation's growth, revenue, and profitability, which were directly related to the price PCA would pay in the future for the phased buyout of the remainder of Askari's interest in the Company.

### After the Sale, Defendants Acted Fraudulently, in Bad Faith and in Breach of Contract to Suppress the Purchase Price for Askari's and the Sina Members' Interests

111.   Throughout the course of the negotiations, PCA represented to the sellers, including Askari, that the purpose of the sale was to bring OncoMed's business model to a national platform and that PCA would provide the resources and, together with Askari, expertise to achieve that national expansion as reflected in the agreed upon Plan.

112.   Immediately after the sale, Weishar publicly announced the promises he had previously made to Askari:

> The investment in Onco360 allows PharMerica to expand its presence in the rapidly growing oncology market. Onco360's annual revenues are currently in excess of $100 million, and we believe revenues will grow rapidly over the next several years. <u>PharMerica has the financial resources, expertise and scale to bring</u> <u>Onco360's *unique pharmaceutical care model* to a national</u> <u>platform</u> and make best-in-class oncology pharmacy care more accessible than ever (emphasis added).

113.    However, despite Weishar's claim that PCA would provide "expertise" to grow the Company, upon assuming control of the Company PCA embarked upon a course of conduct that was designed to depress the amount that PCA would eventually have to pay in order to purchase the remaining interests in the Company.

114.    First, PCA failed to hire a CEO, as was contemplated and agreed to in the Plan. Instead, PCA appointed Bob Bestvina ("Bestvina"), a professional with no experience with oncology specialty pharmaceuticals, as the Company's interim Facility Manager. Bestvina had no experience in infusible and injectable compound services; his experience being limited to distributing oral pharmaceutical products.

115.    As an interim consultant, Bestvina visited the Great Neck hub pharmacy and, contrary to the Plan and in direct opposition to the operations of the Company's core profitable business mode, directed that all pharmacy operations throughout the Company be decentralized.

116.    Bestvina then stopped all plans to expand the pharmacy operations in accordance with the three-year Plan, including any plans to open new pharmacies in key locations and any plans to expand to a national level the Company's infusible and injectable prescription base.

117.    From December 6, 2013 until early May 2014, Askari continued to serve as the Company's Vice Chairman and Chief Clinical Officer. During that time, despite Bestvina's actions, Askari consistently attained his monthly top and bottom line budgeted target levels as set forth in the agreed upon Plan and increased sales by 50%. In reaching those goals, Askari

31

continued to build all areas of the Company's services, including the high-profit injectable, infusible, and oral oncology specialty pharmaceuticals.

118.    Nonetheless, in May 2014, only five months after the sale was completed, PCA summarily dismissed Askari from his executive position.

119.    Immediately after Askari was terminated, PCA informed Ellen Scharaga ("Scharaga"), the Company's Operations Manager, that "effective immediately", she would no longer have any direct responsibility for Pharmacy Operations and, in June 2014, Scharaga's position was eliminated from the Company.

120.    In July 2014, Scott Feigeles ("Feigeles"), the Company's Chief Pharmacist was terminated from his position.  Askari and Feigeles were the two pharmacists historically in charge of overseeing and supervising the Company's infusible and injectable services at the Great Neck "hub" facility. This also would serve to further depress the price due plaintiff pursuant to Section 9.2 of the Operating Agreement.

121.    Thereafter, PCA continued to further gut the Great Neck pharmacy staff, including the senior pharmacy technicians with significant experience in infusible and injectable oncology specialty pharmaceutical compounding, all contrary to the agreed Plan and all designed to further depress the price due to Plaintiff pursuant to Section 9.2 of the Operating Agreement.

122.    After terminating Askari and the senior staff at the Great Neck pharmacy, PCA made no attempt to hire a qualified replacement for Askari to oversee the Company's Great Neck pharmacy operations, which eventually resulted in significant dispensing mistakes with compounding, infusible, and injectable prescriptions.   This disregard for proper operating procedure served to further depress the price due to plaintiff pursuant to Section 9.2 of the Operating Agreement.

123.   In approximately October 2014, PCA hired Jardina as the new Chief Executive Officer and President for the Company.  Jardina, like Bestvina, had no prior experience with oncology pharmacy operations and no experience with infusible and injectable specialty pharmacies.

124.   Jardina immediately restructured the Company's sales force and instructed all sales personnel to focus exclusively on selling oral oncology products, which have low profit margins as compared to infusible and injectable service lines, which provide much higher profit margins and which in turn would result in a higher purchase price due to Askari.

125.   In or about approximately the end of 2014, Jardina informed Askari that the Company was no longer pursuing the high-profit infusible and injectable service lines despite the fact that these service lines were the core of the Company's business and an integral part of the Plan.

126.   At or about that time, Jardina announced that Julie Owens ("Owens"), a long-time PMC pharmacist, was being hired to head the Louisville pharmacy.

127.   Soon thereafter, PCA announced that the Company was being moved to Louisville, Kentucky where PCA's corporate headquarters are located, far away from the Company's traditional markets and the established hub of the successful OncoMed hub-spoke business model.  Thereafter, Owens assumed Askari's position, which she still holds.

128.   During the negotiations leading up to the sale, there was no mention of moving the Company to Kentucky, and the agreed upon Plan, which reflected the anticipated markets of expansion, did not include plans to relocate to Kentucky.  The Plan also reflected no budgeted costs for relocation to Kentucky.  Nor did the Plan contemplate promoting a long-time PMC pharmacist to run Pharmacy Operations from the Kentucky facility.

129.    As events described above unfolded, Askari objected to the Company's actions and their anticipated (and now confirmed) negative impact on the Company's EBITDA, which is the basis for measuring the Purchase Price due plaintiff pursuant to Section 9.2 of the Operating Agreement.

130.    As a result of Askari's stated objections to the Managers' decisions, in approximately April 2014, Askari and PMC's General Counsel Thomas Caneris and Jardina began discussions of PCA's early buyout of Askari's total interest in the Company.   In connection with those discussions, on or about April 17, 2015, Jardina provided Askari with a document calculating PCA's estimated complete early buyout amount (the "Projection Sheet").

131.    At that time, Jardina advised, "The EBITDA projections are a bit lower than the original projections that you and Burt agreed to as part of PharMerica's purchase of the company. . . ." Those "agreed to" projections were reflected in the Plan.

132.    The Projection Sheet made significant assumptions regarding the buyout.   In particular, the Projection Sheet valued the Company at approximately $24,500,000 of which Askari indirectly owned 49%.  Notably, in calculating the buyout price, the Projection Sheet assumed a debt amount of approximately $16,000,000, approximately $500,000 below the maximum amount of the Loans permitted under the Purchase Agreement, the Loan Documents and the Operating Agreement.  The Projection Sheet assumed the $16,000,000  amount through 2016, the date of the initial buyout.  The Projection Sheet assumed no debt for the years 2017 through the end of 2018 (the date of the second buyout).

133.    Ultimately, the parties were unable to agree upon a valuation for a complete buyout at that time and the negotiations for the early buyout failed.  When it became apparent that the negotiations had failed, on or about April 27, 2015, Jardina advised Askari, ". . . I don't

know where to go from here, <u>other than to try to maximize your shareholder value through building the company and maximizing your contractual buyout</u>. . . ." (emphasis added).

134.     Contrary to Jardina's representation that he would work to maximize the price of Askari's buyout from the Company, PCA thereafter continued on the path to depress earnings and in fact implemented a plan to create unauthorized loans by the Company that would serve to reduce the Purchase Price for the Askari and the Sina Members' interests to nothing and for which there was no meaningful business purpose.

135.     In approximately May 2015, Jardina held a telephone conference with Askari concerning the status of the Company.  During that call, Askari repeated his concerns about the loss of the profitable infusible/injectable lines and the Company's willful disregard of any obligation to maximize the Company's profitability, all contrary to the agreed Plan.

136.     Askari also objected to the use of the Company's working capital in a way that appeared to increase revenue while lowering profit rate, which was contrary to the assumptions the parties agreed upon when they entered into the Purchase Agreement, Operating Agreement and the Plan; and all negatively impacting EBITDA.  The Company was piling on debt in a manner that dragged down EBITDA and lowered PCA's price payable to Plaintiff for his Company equity.

137.     In response to Askari's objections, Jardina represented to Askari that the increase in debt would serve to benefit the Company and increase the buy-out price.

138.     Thereafter, on or about June 5, 2015, after the early buyout negotiations had failed, without any notice to Askari, and without the Sina Members' approval (as was their right in respect of a Major Decision), the Company entered into an Amended and Restated Revolving Note (the "First Amended Note") that, in violation of the express terms of the Purchase

Agreement and Operating Agreement, purported to unilaterally give PCA the ability to increase the Company's working capital debt owed to PCA to approximately thirty million ($30,000,000) dollars.

139.    The purported working capital debt increase under the Amended and Restated Note was structured to cause the "Net Debt" to exceed $35,000,000 on the date of the first buyout period. In fact, PCA advanced purported working capital loans to the Company at the extraordinary rate of $2 million every thirty days in order to reach the amount of $35,100,000 in loans that it claimed constituted "Net Debt", far in excess of the agreed upon maximum amount of "Net Debt" ($16,500,00 minus the Company's cash and cash equivalents), as of the date of the first buyout period.

140.    No explanation for the purpose of the loans was provided to Askari despite his repeated requests.

141.    In other words, in violation of the Purchase Agreement, Operating Agreement, and the Plan, PCA unilaterally made an unauthorized Major Decision to grant itself the right to place a $36,500,000 encumbrance on the Company's assets that would mature on the date of the initial buyout, providing PCA with a purported basis to claim that the Purchase Price of the first phase of PCA's buyout of Askari's equity interest in the Company was $1.00.

142.    Nearly one month later, on or about June 30, 2015, PCA forwarded a copy of the First Amended Note to Askari's prior attorney with no explanation and without a request for his consent.

143.    Neither Askari nor the Sina Members ever consented to such a loan increase or additional lien on Company assets and, indeed, Askari continued voicing strong objections as to

how the Company was being operated. Each time his objections were met with representations that Askari would ultimately benefit in terms of an enhanced buy-out price.

144.    Soon thereafter, in approximately August 2015, Defendant Weishar, on behalf of PCA and Defendant Jardina, on behalf of the Company, informed Askari that they were no longer interested in receiving Askari's thoughts about the Company, despite an obligation to obtain his consent to Major Decisions as a manager of the Sina Members, including increases in PCA's loans to the Company.

145.    Thereafter, PCA and the Defendant Managers continued to operate the Company in a manner that significantly increased costs and debt without producing any corresponding increase in profit and EBITDA.

146.    Askari continued to express his dissatisfaction with how PCA and the Managers were running the Company and their broken contractual promises. Each time, Askari expressed his dissatisfaction he received representations from both Jardina and Weishar that the actions were being taken would benefit Askari.

147.    In approximately April 2016, Askari entered in discussions with PCA in an effort to again effectuate an early buyout of Askari's 49% indirect ownership interest in the Company.

148.    On or about May 30, 2016, in connection with those discussions, PCA valued the Company in an amount of forty-eight million dollars ($48,000,000) for the purposes of the buyout of the Sina Members' 62.5% interest.   PCA then subtracted of $32,000,000 debt (including $25,500,000 of Working Capital Loans made by PCA constituting $15,500,000 more than the agreed upon cap for such Working Capital Loans) from the purchase price calculation.

149.    While Defendants improperly included the $25,500,000.00 working capital debt, there was no mention in any of the documentation provided to Plaintiff Askari at this time that the Company contemplated any further encumbrances or loans.

150.    By letter dated, June 3, 2016, Askari, through his attorney, objected to PCA's improper inclusion of the increased working capital debt in calculating the purchase price and asserted that the unauthorized debt constituted an equity contribution in the Company because it was unauthorized by the Operating Agreement and was not subject to loan documentation other than the fallacious unilateral increase to the Working Capital Loan.

151.    That letter further asserted that Section 9.1(a) of the Operating Agreement provides that PCA had the right to purchase up to 30.5% of the Membership Interest owned directly or indirectly by Askari.  Askari's indirectly owned Membership Interest is 49% of the Company (by virtue of his 78.4% ownership of the Sina Members).  By the express terms of Section 9.1(a) of the Operating Agreement, the Company would be entitled to purchase 30.5% of Askari's 49% Membership Interest, or approximately 14.95% of total Membership Interest in the Company (not the 30.5% claimed by PCA ).

152.    In response, PCA sent an email disputing Askari's interpretation of Section 9.1 of the Operating Agreement and PCA's violation of the Major Decision clause in the Operating Agreement. Under PCA's interpretation of the Operating Agreement, PCA would achieve an approximately 80% ownership interest in the Company after the first buyout, leaving Askari with an approximately 20% ownership interest in the Company.  In that case, PCA would achieve absolute control rights under the Operating Agreement and would not be subject to any blocking rights negotiated by Plaintiffs. In other words, PCA would divest Plaintiff Askari of *any* rights

under the Operating Agreement, even though he would still (according to PCA's bad faith view) own 20% of the Company.

153.   Under the correct interpretation of the Operating Agreement, after the first buyout, PCA would own an approximately 66% share of the Company and Askari would own an approximately 34% share of the Company.  In that case, PCA would become a majority unitholder subject to Mr. Askari's continuing blocking right for any Major Decision, including the decision to accrue additional secured debt that would inevitably wipeout any money owed to Askari at the time of the second buyout provided for in the Operating Agreement.

154.   On or about June 22, 2016, Askari, through counsel, withdrew from the negotiations concerning an early buyout and repeated his positions concerning disputes under the Operating Agreement and again asserted that the Company's First Amendment to the Loan Agreement increasing the working capital loan up to $30,000,000 constituted an equity investment.

155.   So that, among other things, Askari could determine whether there was any legitimate business reasons for Defendants' larding of the Company's balance sheet with secured debt not contemplated previously by the parties in either the Plan or the Projection Sheet, Askari's attorney also demanded an inspection of the Company's books and records pursuant to Section 6.1 of the Operating Agreement and subsequently requested dates for appropriate person to inspect the Company's records.

156.   Further indicative of Defendants' bad faith, the Company failed and refused to make the books and records available to Askari or his representatives.

157.   Instead, on October 6, 2016, attorneys representing the Company, PCA and PMC sent an email to Askari's attorney indicating that Defendants had once again entered into another

amendment to the Loan Agreement, further encumbering the Company's assets and potentially driving down any Purchase Price without the required consent under the Operating Agreement. The e-mail stated no business rationale for additional indebtedness and merely stated, "In accordance with past practice, attached is the documentation amending the Loan Agreement to increase the credit line.  Please forward to your client. Let me know if you have any questions."

158.    Pursuant to this new Amendment to the Loan Agreement (the "Second Amended Loan Agreement"), PCA unilaterally and in violation of the Major Decisions protection bargained for by Plaintiff, purported to increase the Working Capital Loan by another thirty-four million dollars ($34,000,000) bringing potential "Net Debt" to be subtracted from the Purchase Price up to $70.5 million ($70,500,000).  Like the initial unauthorized increase in the working capital debt, that debt was not a part of the agreed upon Plan, the Projection Sheet or any of the projected buyout valuations previously provided by the Company.  Like the first unilateral increase in the unauthorized working capital debt, the effect of the purported second increase would be to completely offset the value of the purchase price for the second buyout of Askari's interests in the Company.

159.    On October 7, 2016, Askari, through counsel, objected to the Second Amendment to the Loan Agreement and asserted that Section 4.8(b)(B) of the Operating Agreement provides that such a loan transaction constitutes a Major Decision requiring the approval of the Members constituting at least a 75% Membership Interest and that the unauthorized transaction constituted a contribution to the capital of the Company's common equity (of which the Sina Members owned  62.5%).

160.    By letter dated October 26, 2016, attorneys for the Company took the position that the Second Amendment to the Loan Agreement was "expressly authorized" under Section 5.9 of the Operating Agreement.

161.    Section 5.9 of the Operating Agreement does not relate to the Working Capital Loan.   Rather, the Working Capital Loan is expressly provided for in Section 5.8 of the Operating Agreement and other parts of the agreement.

162.    Section 5.8 of the Operating Agreement expressly limits the amount of secured debt permitted under the Operating Agreement and provides that the "contemplated" debt amongst the parties is "defined in the Purchase Agreement[.]"

163.    As set forth above, the intercompany debt contemplated by the Purchase Agreement defined by the Purchase Agreement to be, "advances to Borrowers up to the aggregate principal amount of $10,000,000.00 (the "Working Capital Loan", and together with the Term Loan, the "Loans") (emphasis added).

164.    Section 5.8 of the Operating Agreement further expressly provides that the incurrence of "*any* additional lien . . ., security interest or other similar encumbrances on all or any substantial portion of the Company" is a Major Decision that requires the consent of the Members holding at least a 75% Membership Interest in the Company.

165.    PCA demonstrated that it had, in bad faith, engaged in a course of conduct specifically designed to deprive Askari and the Sina Members of the benefit of the bargain they had made and deprive them of their equity in the Company without compensation, when on December 7, 2016, PCA sent a notice purporting to exercise their rights to acquire Askari and the Sina Members' interests in the Company for one dollar ($1.00).

166.    Askari, on behalf of himself and the Sina Company Members, promptly rejected the notice and subsequently returned the PCA's check for one dollar ($1.00).

167.    At the time PCA purportedly exercised the call right on December 7, 2016 the 12 month trailing EBITDA figure for the period December 2015 through November 30, 2016 utilized by PCA was $1,846,053. Subsequently, when the profit and loss statements for the Company were released for the calendar year 2016, EBITDA jumped to $4,682,000.00, indicating that EBITDA increased by nearly $3,000,000 in the month following the exercise of the call right (December 2016) when compared to December 2015, demonstrating Defendants' intentional manipulation of EBITDA.

168.    Based upon the totality of PCA's actions after the December 6, 2013 closing, it is clear that PCA has materially breached all material agreements and understandings that protect Askari leading up to the exercise of PCA's right to purchase further equity (at a contrived depressed Purchase Price) and together with Defendants Weishar, Jardina and Froesel, have acted in bad faith and fraudulently in order to deprive the Sina Members of any benefit of their bargain.

### DEMAND FUTILITY

169.    Plaintiff brings direct claims (i) in his own name, where the wrongdoing alleged breached a duty to him personally as a third-party beneficiary of the Operating Agreement; and (ii) as the majority stockholder of the Sina Members derivatively on behalf of the Sina Members where the wrongdoing alleged breached a duty to those entities.

170.    Demand on the Sina Members to bring such claims directly against Defendants would be futile.

171.    Askari, as alleged, is, and was at all relevant times, a stockholder of each of the Sina Members.  He owns 78.4% of the shares of the collective equity of the Sina Members.

172.    The remainder of the equity interest in the Sina Members is owned by Zweigenhaft.  Pursuant to the bylaws of the Sina Members, the Sina Members act through a two person board consisting of Askari and Zweigenhaft. Zweigenhaft, a former employee of the Company has, upon information and belief, continued to maintain a business relationship with PMC, PCA's parent company and received a substantial fee for introducing PMC to an acquisition target and/or providing advisor services to PMC in connection with the acquisition. Given his ongoing business relationship with PMC and the fact he has aligned himself with the defendants herein in a prior action, it would be futile to seek to obtain his approval for this action.

173.    This action is not brought collusively in an effort to procure jurisdiction.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (Breach of the Operating Agreement against Weishar, Jardina and Froesel as Members of the Board of Managers on Behalf of the Sina Members)

174.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

175.    Weishar, Jardina and Froesel as managers of the company were bound by the Operating Agreement and had duties thereunder.

176.    Pursuant to the Purchase Agreement, the Operating Agreement and the Loan Agreement, the amount of the Working Capital Loan is limited to the principal amount of $10,000,000.

177.    Pursuant to the Loan Agreement, the Loan was secured by a security interest in the Company's assets.

178.    Pursuant to the Operating Agreement, a Major Decision requires the prior affirmative consent of 75% of the Membership Interests.

179.    Pursuant to the Operating Agreement, the granting or incurrence of any lien, mortgage, charge, pledge, security interest or other similar encumbrance on all or any substantial portion of the assets of the Company or Subsidiaries, except as contemplated by the Loan Documents (which set a maximum amount of debt and secured loans), is a Major Decision requiring the prior affirmative consent of 75% of the Membership Interests.

180.    Defendants Weishar, Jardina and Froesel authorized the First Amendment to the Loan Agreement and Defendants Weishar and Jardina authorized the Second Amendment to the Loan Agreement and the related promissory note amendments.   Both increases in loans were secured and required an encumbrance on the Company's assets.   Neither loan increase was contemplated by the Loan Documents because they both exceeded the $10,000,000.00 limit set therein.   As such, entering into both increases in loans constituted a Major Decision for purpose of the Operating Agreement.

181.    Yet, Defendants Weishar, Jardina and Froesel failed to obtain the prior consent of the Sina Members for the unilateral increase of secured debt above the permitted cap of $10,000,000.00 for the Working Capital Loan, defined in the Operating Agreement, the Purchase Agreement and the Loan Agreement.   This failure constituted a breach of the Operating Agreement and rendered the unilateral increases null and void.

182.    Weishar, Jardina and Froesel's failure to secure the necessary consents in violation of the Operating Agreement was intentional and in bad faith to serve the interests of their employers (PMC and PCA).   In particular, both unauthorized intercompany loan

transactions depressed the amount of PCA's Purchase Price for the first phase of the purchase of Plaintiff's remaining interests in the Company.

183.    Moreover, these loans served no legitimate business purpose as reflected by the fact that these loans were not contemplated in the Plan, the Projection Sheet or, as to the Second Amendment to the Loan Agreement, the materials Defendants provided Plaintiffs during their buyout discussions.    Defendants further pumped these funds into the Company at an extraordinary rate of speed, which, on information and belief, could not be justified by the Company's cash needs.    Further, Defendants denied Plaintiff access to books and records to better understand the need for these loans.    Defendants also failed and refused to articulate any business reason for the increase in the working capital debt, despite Plaintiff's demand that they do so.    Finally, Defendants caused the Company to incur this additional unnecessary and unauthorized indebtedness immediately after the negotiations for an early buyout of Askari's interests failed.    This timing reinforces the conclusion that these loans served no bona fide business purpose of the Company but, rather were designed solely to benefit PCA and artificially depress the Purchase Price for Plaintiff's Interests.

184.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A SECOND CLAIM FOR RELIEF

**(In the Alternative to Count I, Breach of Covenant of Good Faith and Fair Dealing Against Weishar, Jardina, Froesel and PCA on Behalf of the Sina Members and Askari)**

185.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

186.    Defendants Weishar, Jardina and Froesel, as members of the Board of Managers, unilaterally authorized the Company to borrow from PCA up to $70.5 million and did in fact

borrow $35,100,000 from PCA as of December 7, 2016 of which $28,600,000.00 constituted purported working capital loans

187.    Even if the Sina Members consent was not required to effectuate the First and Second Amendments to Loan Agreement, Defendants could not enter into these transactions to undermine the Purchase Price to be paid Askari and the Sina Members pursuant to the buyout without violating the implied covenant of good faith and fair dealing that inures in every contract.

188.    Indeed, had the parties contemplated the issue at the time of contracting, they would not allow those in control of the Company to take unilateral actions to manipulate the Company's capital structure for the purpose of depressing the Purchase Price to be paid to Plaintiffs.

189.    As noted above, the First Amendment to Loan Agreement and the Second Amendment to Loan Agreement served no bona fide business purpose.

190.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Against PCA for Tortious Interference with the Operating Agreement on Behalf of Sina Members and Askari)

191.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

192.    The Managers were obligated by Section 5.8 of the Operating Agreement to obtain the consent of Plaintiffs before entering into the First and Second Amendments of the Loan Agreements.  Additionally, pursuant to the implied covenant, Defendants could not enter into loan transactions that served no *bona fide* business purpose except to manipulate the Company's capital structure, depress the Purchase Price to be paid to Plaintiffs pursuant to the

buyout and deny Plaintiffs the benefits of their bargain.  As indicated above, the Managers breached these contractual obligations.

193.    PCA was aware of the terms of the Operating Agreement.

194.    PCA, intentionally and without justification, caused these breaches and tortiously interfered with Plaintiffs' contractual rights under the Operating Agreement.  PCA -- through its control of the Managers, all of whom were PCA officers or officers of its parent company, PMC -- caused the Company to deviate from the Plan and enter into the First and Second Amendments of the Loan Agreements, without the appropriate consent, even though the loans served no *bona fide* business purpose and were made for the purpose of decreasing PCA's cost to purchase Plaintiffs' interests in the Company.

195.    Plaintiffs suffered injury by this action in that PCA purchased Plaintiffs' valuable interests in the Company for $1 and manipulated the Company's capital structure to the detriment of any future buyout Purchase Price.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
**(Against PCA for Unjust Enrichment on Behalf of Sina Members and Askari)**

196.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

197.    PCA was the beneficiary of the Managers' fraud and breaches of the Operating Agreement's consent and implied provisions, as described herein.

198.    By reason of the foregoing, PCA was unjustly enriched to the detriment of Plaintiffs, without lawful justification.

## AS AND FOR A FIFTH CLAIM FOR RELIEF
**(Breach of Contract Against PCA with Respect to the Calculation of Net Debt for Purpose of Calculating the Purchase Price on Behalf of Askari)**

199.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

200.    Should the Court determine that PCA may exercise any purchase rights under the Operating Agreement, nonetheless, it should declare the $1 tendered to Askari was in breach of the Operating Agreement and re-calculate the buyout price using, no more than $16,500,000 of secured debt from PCA for purposed of setting "Net Debt."

201.    Askari is a named third-party beneficiary of the sale and purchase right in Section 9.1 of the Operating Agreement with standing sue individually for breach of those rights.  PCA owed a duty under that section to pay Askari the Purchase Price as set forth therein.

202.    Specifically, Section 9.2(a) of the Operating Agreement sets forth a formula for the purchase price of a Membership Interest pursuant to Section 9.1(a) that requires the subtraction from an EBITDA-based amount of a figure denominated "Net Debt."  "Net Debt" is explicitly defined in the Operating Agreement as $6,500,000 plus the amount of debt owed under the "Working Capital Loan", <u>minus</u> the Company's cash and cash equivalents. "Working Capital Loan" is then defined in the "Loan Documents (as defined in the Purchase Agreement)."  The Loan Agreement defined "Working Capital Loan" as "advances to Borrowers up to the aggregate principal amount of $10,000,000.00."

203.    Thus, the "Net Debt," as used in Section 9.2(a) means $6,500,000 plus an amount of indebtedness "up to the aggregate principal amount of $10,000,000.00, minus the Company's cash and cash equivalents".   Therefore, Net Debt cannot exceed $16,500,000 minus the

Company's cash and cash equivalents which stood at approximately $4,000,000 as of the time PCA purportedly exercised the first call right.

204.    PCA's attempt to use a figure for the defined "Net Debt" term in the Section 9.2(a) in the first phase of the buyout that  utilized PCA secured debt in excess of the agreed upon debt cap of $16,500,000 constitutes an inherent breach of the Operating Agreement and was made in bad faith in order to depress the Purchase Price for Askari's interest in the Company.

205.    Should the Court determine that PCA may exercise any purchase rights in all cases Askari is entitled to payment for his interests in the Company according to the agreed-upon contractual formula where "Net Debt" is no greater than (a) $16,500,000 or such lower amount as is determined to be reasonable and necessary for the Company's needs based upon an examination of the Company's books and records consistent with the Plan, minus(b) the Company's cash and cash equivalents.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
**(Declaratory Judgment with Respect to the Amount of the Interest to Be Acquired by PCA on Behalf of Askari)**

206.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

207.    By the express terms of Section 9.1(a) of the Operating Agreement, PCA would be entitled to purchase 30.5% of Askari's 49% Membership Interest, or approximately 14.95% of total Membership Interest in the Company (not the 30.5% claimed by PCA) in the exercise of the first call right.

208.    PCA's overreaching attempt to purchase 30.5% of the Company's outstanding Membership Interests indirectly owned by Plaintiff Askari is made in bad faith for the purposes

49

of solidifying its control of the Company and depriving Plaintiffs' of their consent rights going forward.

209.   PCA's claim to be entitled to purchase 30.5% of the Company's Membership Interest from Askari in the first phase of the buyout would give it an approximately 80% interest in the Company, thereby eliminating Askari's ability to block PCA from making Major Decisions without Askari's consent.

210.   The Operating Agreement was specifically drafted to provide Askari with blocking rights until his interest was completely bought out in the second phase of the buyout.

211.   Should this Court determine that PCA may exercise any purchase rights under the Operating Agreement, Plaintiff seeks an order declaring that the Operating Agreement for the first buyout entitles PCA to acquire a 30.5% of Plaintiff Askari's remaining indirect interest in the Company, which amounts to a 14.95% overall interest in the Company from the Sina Members' in respect of Plaintiffs' holdings.

## AS AND FOR A SEVENTH  CLAIM FOR RELIEF
### (Damages for Breach of the Operating Agreement against Weishar, Jardina and Froesel as Members of the Board of Managers on behalf of the Sina Members)

212.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

213.   Pursuant to the Operating Agreement, "Estimated Tax Amount" is defined as:

> "Estimated Tax Amount" means, in respect of any Member for any estimated tax period, the amount of income and gain (and each item thereof) expected to be allocated to such Member for federal income tax purposes with respect to such estimated tax period, as estimated by the Board of Managers (provided that such taxable income shall be determined with regard to items of income, gain, loss or deduction allocable under Code Section 704(c) and with regard to any adjustment to the taxable income, gain, loss or deduction for a Member (or Economic Interest Holder) as a result of any adjustments to the basis of the Company's assets on behalf of

50

such Member (or Economic Interest Holder) pursuant to a Code Section 754 election), multiplied by the highest combined marginal federal, applicable state and city personal income tax rates (the "Effective Tax Rate") on each type of taxable income and gain included in such estimate, taking into account (a) the nondeductibility of any item for state income tax purposes that is deductible for federal income tax purposes and (ii) the deductibility for federal income tax purposes of state income taxes. The Estimated Tax Amount for any estimated tax period in which such Member is expected to be allocated net loss for federal income tax purposes shall be deemed to equal zero. The Effective Tax Rate utilized to calculate the Estimated Tax Amount for any estimated tax period shall be the same for all Members.

214.    The Operating Agreement, at Section 4.8 provides as follows:

4.8 <u>Tax Distributions</u>.  Notwithstanding Section 4.2, the Board of Managers shall cause the Company to distribute to each Member and Economic Interest Holder, no less than ten (10) days (the "Tax Distribution Date") before each date when a U.S. individual's estimated income tax payment is due, an amount equal the Estimated Tax Amount determined for each Member in respect of such estimated tax period, reduced by the amount of all distributions made to such Member pursuant to Section 4.2o or this Section 4.8 since the previous Tax Distribution Date.  In addition, within seventy (70) days after the end of each Fiscal Year, the Company shall distribute to each Member an amount equal to the excess of (a) such Member's tax liability with respect to such Fiscal Year over (b) the sum of all Estimated Tax Amounts distributed to such Member with respect to each estimated tax period within such Fiscal Year.  For purposes of this Section 4.8, taxable income shall be determined with regard to items of income, gain, loss or deduction allocable under Code Section 704(c) and with regard to any adjustment to the taxable income, gain, loss or deduction for a Member (or Economic Interest Holder) as a result of any adjustments to the basis of the Company's assets on behalf of such Member (or Economic Interest Holder) pursuant to a Code Section 754 election.  All distributions made to a Member pursuant to this Section 4,8 shall be applied to, treated as included in, and reduce the next succeeding distribution(s) to be made to that Member pursuant to Section 4.2 or Section 10.2(d).

215.    Pursuant to Section 4.8 of the Operating Agreement and the definition of

"Estimated Tax Amount" contained in the Operating Agreement, it is clear the Board of

Managers could not take a credit against the Company's' obligations to make tax distributions in any current year. In the Company's counsel's letter dated April 21, 2016, the Board of Managers took such a position in an attempt to further frustrate and willfully harm Plaintiff's interests in the Company.

216.    Contrary to the express direction of Section 4.8 the Board of Managers failed to distribute to the Sina Members the required distribution in an amount equal to the Estimated Tax Amount determined for the Sina Members during 2016 and has failed to make the required distribution for the first quarter of 2017.

217.    The Board of Manager's breach of the Operating Agreement damaged Plaintiff.

### AS AND FOR A EIGHTH  CLAIM FOR RELIEF
**(Damages for Fraud by Weishar and Jardina on behalf of the Sina Members and Askari)**

218.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint, as though more fully set forth at length herein.

219.    As alleged above, the Company was to be operated pursuant to the agreed upon Plan.

220.    After the closing of the sale of a portion of the Sina Members' interest to PCA, Weishar and Jardina caused the Company to deviate from the Plan, by among other things, firing Askari, by moving the Company's operations and changing the business model, by failing to employ a competent and experienced chief executive officer for the Company.

221.    Askari objected to Weishar and Jardina about the Company's actions and asserted that these actions were contrary to the terms of the sale and were intended to depress PCA's purchase price for the buy-out of his interest. Askari threatened legal action.

222.    In response to each of Askari's objections, Weishar and Jardina personally assured Askari and, indirectly, the Sina Members that this was not the case. Rather, they

represented that Defendants' actions would ultimately benefit the Company and would increase any buy-out Purchase Price. These representations were repeated at the meetings of the Board of Managers that Askari attended.

223.    Askari attempted to negotiate an early buy-out in order to preserve the value of his equity interest in the Company but on each occasion the negotiations failed to result in an adequate offer.

224.    However, as alleged above, on April 27, 2015 Jardina assured Plaintiff Askari (and, indirectly, the Sina Members) that the operations of the Company would be such that their contractual buyout would be maximized.

225.    Contrary to Jardina's representation, on June 5, 2015 the Company entered into the First Amendment to the Loan Agreement and amended the related promissory note, unilaterally increasing the working capital debt of the Company and thereafter took the position that Askari's interest in the Company was worthless.

226.    Askari, relying upon defendants' representations that the Company was not being operated to decrease EBITDA, did not take immediate legal action to rescind the transaction or enjoin the exercise of the call right.

227.    The representations made by Weishar and Jardina were false when made and they knew that the representations were false in that they intended to cause the Company to be operated in a manner that would increase the Company's revenues but decrease EBITDA so as to decrease the Purchase Price for Plaintiffs' interests, enabling PCA not only to purchase all of Plaintiff's and the Sina Members' interests at less than fair market value, but to artificially inflate the reported revenues of PMC, a publicly traded company.

228.    At the time PCA purportedly exercised the call right on December 7, 2016 the 12 month trailing EBITDA figure for the period December 2015 through November 30, 2016 utilized by PCA was $1,846,053. Subsequently, when the profit and loss statements for the Company were released for the calendar year 2016, EBITDA jumped to $4,682,000.00, indicating that EBITDA increased by nearly $3,000,000 in the month following the exercise of the call right (December 2016) when compared to December 2015, demonstrating Defendants' fraudulent intent.

229.    As a result of the reliance on Weishar and Jardina's continuing false representations Askari refrained from taking immediate legal action resulting in the loss of Askari's and the Sina Members' interest in the Company  in  an amount to be proved at trial in excess of $75,000 and punitive damages to be determined by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for an order of judgment granting the following relief:

A.    A declaration that the First Amendment to the Loan Agreement and the Second Amendment to the Loan Agreement entered in without the required 75% membership interest consent are null and void;

B.    A declaration that the purported exercise of PCA's purchase rights on December 7, 2016 is null and void and that PCA has no further rights under the Operating Agreement, including but not limited to the right to purchase any Sina Members' interests pursuant to the Operating Agreement, the right to control the Company and to appoint the Company's Board of Managers, and the right to exercise drag along rights under the Operating Agreement;

C.    Alternatively, should this Court determine that PCA may exercise any purchase rights under the Operating Agreement, this Court should award Plaintiff the difference between the $1 PCA tendered and a purchase price calculated as the fair market value of the Company as determined after an accounting of the books and records of the Company or, if not fair market value, a valuation based on the projections set forth in the Plan.  This Court should issue a further declaration that any money exchanged through unauthorized amendments to Loans is equity in the Company;

D.    Alternatively, should this Court determine that PCA may exercise any purchase rights under the Operating Agreement, an award to Plaintiff Askari of the difference between the $1 PCA tendered to him and a purchase price calculated as the fair market value of the Company as determined after an accounting of the books and records of the Company or, if no fair market value, a valuation based on the projections set forth in the Plan;

E.    A declaration that any money exchanged through unauthorized amendments to the Loans is equity in the Company and that any future buyout Purchase Price cannot include these amounts as debt;

F.    Alternatively, and again only if the Court does not apply a valuation stated above, an award to Askari of payment for his membership interests  where "Net Debt" includes an amount of PCA secured debt  no greater than $16,500,000 or such lower amount as determined to be reasonable and necessary for the Company's needs based on an examination of the Company's books and records;

G.   Alternatively should the Court determine that PCA may exercise any purchase rights under the Operating Agreement declaring that first buyout entitles PCA to acquire 30.5% of Plaintiff Askari's remaining interest in the Company, which amounts to a 14.95% overall interest in the Company;

H.   Damages for Defendants' failure to make the distributions required under Section 4.8 of the Operating Agreement;

I.   Damages for Defendants' fraud, including punitive damages;

J.   The costs and disbursements of the action, including reasonable attorneys' fees and experts' fees, costs and expenses;

K.   Pre- and post-judgment interest; and

L.   Such other and further relief as the Court deems just and proper.

ROSENTHAL, MONHAIT & GODDESS, P.A.

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
Attorney for plaintiff Kaveh Askari

OF COUNSEL:

Steven R. Schlesinger, Esq.
Shannon E. Boettjer, Esq.
Jaspan Schlesinger LLP
300 Garden City Plaza, 5th Floor
Garden City, New York 11530
(516) 746-8000

June 30, 2017